*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BRUCE ANDREW BAKER d/b/a BAKER LEASING, LLC, | ) ) ) | Supreme Court No. S-15354 |
| Appellant, | ) ) | Superior Court No. 3AN-12-11199 CI |
| v. | ) ) | O P I N I O N |
| RYAN AIR, INC., | ) ) | No. 6990 – March 27, 2015 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Christopher D. Cyphers and Michael A. Rose, Frontier Law Group, LLC, Anchorage, for Appellant. Roy Longacre, Longacre Law Offices, Ltd., Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.

# I.     INTRODUCTION

Ryan Air entered into a contractual agreement to sublease an airport lot in Kotzebue. The agreement gave Ryan Air an option to purchase the leasehold and apply its rent payments to the final purchase price. But when Ryan Air attempted to complete

the purchase, Bruce Andrew Baker d/b/a Baker Leasing, LLC, the other party to the contract, disputed the outstanding balance and sent Ryan Air a notice of breach.

Both parties brought their claims to the superior court. After a trial, the court concluded that Ryan Air did not materially breach the contract and ordered the parties to proceed with the transfer. Baker appeals the order, arguing that the court's factual findings regarding his breach claims were clearly erroneous, that the conveyance documents contained warranties beyond those he was contractually obligated to provide, and that Ryan Air's attorney's fees award was unreasonable.

We conclude that the court's findings were not clearly erroneous, that the warranties contained in the conveyance documents did not exceed Baker's contractual requirements, and that Ryan Air's attorney's fees were reasonable. We therefore affirm the superior court's judgment in most respects. However, the parties agree that the superior court double-counted some of Ryan Air's rent payments, and we remand to allow the superior court to address the issue.

## II.    FACTS

This dispute concerns Lot B, Block 1 of the Kotzebue Airport Lease Lots and the two buildings constructed on it. The lot and the buildings (together, the property) are owned by the State of Alaska, Department of Transportation (DOT).

In 1985 Baker Aviation, Inc.[1] entered into a long-term agreement with DOT to lease the property. In December 2001 Baker Aviation and Ryan Air signed an agreement, entitled Earnest Money Receipt and Agreement to Purchase (Purchase Agreement), whereby Ryan Air would purchase the leasehold from Baker Aviation for $600,000 within 105 days. The Purchase Agreement specified that Baker Aviation would

---

[1]    Baker Aviation is a separate entity from Bruce Andrew Baker d/b/a Baker Leasing, LLC and is not a party to this dispute. Baker Aviation's principal shareholders are Bruce Andrew Baker's parents.

provide an unconventional deed: "At closing, Seller shall furnish a statutory quitclaim deed . . . , showing free title, clear of encumbrances, except conditions, restrictions, reservations, and rights-of-way of record as accepted by Buyer." Baker Aviation agreed to provide five specific warranties:

> a.      Seller . . . has, or will have, full power and authority to execute this agreement and perform Seller's obligations hereunder;
>
> b.      The sale of the Property by Seller does not violate any applicable statute, ordinance[,] or regulation, nor any order of any governmental authority or agency, pertaining to the seller;
>
> c.      There are no claims of lien on the property and Seller has taken no action which would create any such lien in favor of any person;
>
> d.      There are no currently due and payable assessments for public improvements against the property . . . ;
>
> e.      There are no easements or encumbrances affecting the property except as disclosed on the plat and in the preliminary title report delivered in connection with this agreement.

The Purchase Agreement specified that these warranties "shall not merge in the deed of conveyance but shall survive closing."

The closing deadline date came and went. Baker Aviation and Ryan Air were unable to complete the sale because of unacceptable liens against the property. In June 2002 they modified the Purchase Agreement to delay the closing date until at least March 2003. This modification, Addendum 2 to the Purchase Agreement, gave Ryan Air the "sole option" to extend the closing date an additional nine years. The parties agreed that during the interim time, Ryan Air would rent the property for $3,000 per month. They also agreed that "all rental payments made subject to this Addendum [would] reduce

the sales price of the above described property from [the] amount as outlined in the [Purchase Agreement]." Ryan Air agreed in Addendum 2 that "when the property [was] ready for sale under the terms of the [Purchase] Agreement," it would "proceed to complete[] the purchase in a reasonable amount of time."

In May 2003 Baker Aviation and Ryan Air again modified the Purchase Agreement, extending the closing deadline to July 2019. This modification was Addendum 3.

In September 2003 the parties entered into a new Commercial Sublease Agreement With Purchase Option (Sublease Agreement), which maintained Ryan Air's rent at $3,000 per month and incorporated Ryan Air's purchase option as set forth in the Purchase Agreement and Addenda. The Sublease Agreement also contained a number of additional terms, several of which are of particular importance to this litigation. It required Ryan Air to seek and receive written authorization from both Baker Aviation and DOT before making permanent improvements or alterations to the property. It prohibited Ryan Air from assigning, subleasing, or encumbering the property without Baker Aviation's "express prior written consent." It required Baker Aviation to notify both Ryan Air and DOT in writing of any alleged breach — and provide Ryan Air an opportunity to cure — before exercising its legal rights or remedies. It specified that any "amendment, deletion, addition[,] or novation" would be effective only if it were "completely and unambiguously contained in a writing executed by all of the parties." And it provided that "[a]ll legal costs and attorneys fees actually incurred by any party to this Agreement to enforce the duties or obligations of any other party . . . shall be paid to the prevailing party by the other party."

In 2006 the Internal Revenue Service (IRS) placed a levy on the property because Baker Aviation had fallen behind on its tax obligation. From September 2006

to February 2008, Ryan Air sent its monthly rent payments directly to the U.S. Treasury. In April 2008 the IRS released the levy.

Soon after the levy was released, Baker Aviation assigned its interest in the property to the appellant, Bruce Andrew Baker d/b/a Baker Leasing, LLC (Baker). Baker replaced Baker Aviation as Ryan Air's sublessor, but the assignment had no effect on the terms of the Sublease Agreement or Ryan Air's purchase option.

In 2009 Baker approached Ryan Air about increasing its monthly payments from $3,000 to $5,000. Though Ryan Air does not deny that it paid Baker this increased amount from September 2009 to August 2012, the parties disagree about the terms of this "rent increase" and whether it constituted a formal modification of the Sublease Agreement. Baker testified that the parties orally modified the Sublease Agreement to include this rent increase and that Ryan Air agreed that, starting in 2010, rent payments would no longer apply towards the purchase price of the leasehold. In contrast, Ryan Air's President, Wilfred Ryan (Ryan), testified that he had not agreed to modify Ryan Air's contractual rent obligation and that the additional $2,000 per month was merely a prepayment.

At some point between 2008 and 2010, Ryan Air began renovating one of the two buildings on the property. The parties disagree about when the project commenced and whether Ryan Air obtained authorization before proceeding. However, there is no question that Baker emailed DOT in September 2010 to consent to the renovations, and DOT granted a building permit shortly thereafter.

Beginning in July 2011, Ryan Air began subleasing an aircraft tie-down space to DOT. Baker testified that Ryan Air failed to seek or receive prior written authorization for this sublease.

Sometime around July 2012, the parties began to dispute the outstanding balance on the property's purchase price. In late July Ryan Air sent Baker a letter

claiming that the balance was $168,000 and asking whether Baker would be willing to move forward with the sale. Baker replied that the correct balance was $278,000,[2] and he threatened to evict Ryan Air from the property for violating the Purchase Agreement.[3]

In October Ryan Air sent Baker another letter, requesting details about the alleged breaches and claiming that the outstanding balance was $138,161.40. Ryan Air also notified Baker that it would stop paying rent until the sale was completed and would instead rely on deductions from its prepayments to satisfy its required monthly rent.

In November Baker's attorney sent Ryan Air a "Notice of Breach of Contract." The letter claimed that Ryan Air had breached the Sublease Agreement by paying only partial rent in September and failing to pay rent in October and November. Further, it alleged that Ryan Air's renovation project constituted a breach of the Sublease Agreement and that the damages exceeded $250,000. The letter demanded that Ryan Air send Baker a check for $282,607.35 by the end of November to avoid a lawsuit.

## III.   PROCEEDINGS

In November 2012 Ryan Air filed an action for declaratory judgment. Ryan Air asked the superior court to declare that the Purchase and Sublease Agreements remained in full force and effect. Three days later Ryan Air moved for a preliminary injunction to preserve the status quo ante and requested leave to deposit $138,161.40 with the court clerk as security for the injunction.[4] Ryan Air amended its complaint in January 2013; Baker filed his answer later in January and counterclaimed for breach of contract.

---

[2]     In the alternative, Baker offered to compromise for $175,000 plus a Cessna 207 aircraft.

[3]     Baker probably meant to refer to the Sublease Agreement instead of the Purchase Agreement.

[4]     This sum represented Ryan Air's estimate of the outstanding balance on the property.

Rather than hold a separate hearing on Ryan Air's request for a preliminary injunction, the superior court ordered expedited discovery and a prompt trial, which occurred in early July 2013. On the third and final day of the bench trial, the court read its factual findings and legal conclusions into the record.[5] Noting that the parties had never signed a written amendment to the Sublease Agreement, the court found that there was no 2009 contract modification and that Ryan Air's increased payments reflected prepayments, not an increase in the underlying rent. The court calculated that Ryan Air had paid Baker a total of $473,000 in rent and ordered the parties to "work together" in "good faith . . . to complete the sale of the premises for [the remaining] $127,000 as expeditiously as possible."

Because the superior court ordered that the sale should proceed, it determined that Baker's breach of contract claims were moot. In addition, the court found that Ryan Air had not breached the contract by withholding rent payments from September 2012 onwards because it had made significant prepayments to Baker. The court found that Ryan Air's renovation project did not constitute a breach because Ryan Air had received Baker's permission to proceed. The court found that, even if Ryan Air had breached the contract, Baker had failed to send Ryan Air a valid notice of breach because his notice letter "really d[id]n't detail the defects [and] problems" and was not copied to DOT, as required by the Sublease Agreement. And the court found that the tie-down sublease was not a material breach and was "a non-issue in the case." Finally, the court concluded that Ryan Air was the prevailing party and was therefore entitled to attorney's fees under the Sublease Agreement.

---

[5] The superior court asked Ryan Air's attorneys to compile written findings and conclusions based on the court's oral findings. The proposed document was presented to the superior court in August 2013 and issued by the court shortly thereafter.

On July 25 Ryan Air moved to compel the execution of the conveyance documents, arguing that Baker was not working in good faith to complete the transfer of the property. In an attached affidavit, Ryan Air's attorney stated that he had personally delivered conveyance documents to Baker's attorney on July 10, sent a follow-up letter on July 19 inquiring about the status of the documents, and followed up again with a voice message on July 24. Ryan Air's attorney further attested that he had received "no response to any of the above contacts."

Baker opposed the motion to compel, arguing that the warranties in the conveyance documents were not anticipated by the Purchase Agreement. He also claimed that Ryan Air, by delivering the documents in person instead of sending them by certified mail or facsimile, had failed to comply with the Purchase Agreement's requirements for service. Despite Baker's opposition, the superior court granted Ryan Air's motion on August 21 and ordered Baker to deliver the executed documents by August 26.

On August 23 Baker moved for a stay of the order compelling Baker to sign and return the documents, which the superior court denied. Baker simultaneously filed a petition for review, which we denied. Also on August 23, Ryan Air sent Baker discovery requests seeking information about any liens remaining against the property and about Baker Leasing, LLC's assets.

On August 28 Ryan Air asked the court to authorize the leasehold conveyance documents without Baker's signature. The court granted this motion, though Ryan Air never made use of this authorization.

On September 25 Baker's attorney replied to Ryan Air's discovery requests by objecting to every question and request for production. He claimed that the requests were "irrelevant, not likely to lead to admissible evidence or discoverable admissible evidence, unduly burdensome, non-timely, and [sought using] improper procedure."

Also on September 25, Ryan Air, before receiving the discovery objections, moved to compel a response, claiming that the deadline for response was September 23. Baker opposed this motion, arguing that under Alaska Civil Rule 6(c), he had until September 25 to respond to the discovery requests and had timely done so by objecting. Ryan Air supplemented its motion by claiming that Baker's objections were invalid. Baker, in response, pointed out that Ryan Air had failed to confer or attempt to confer with him about his discovery objections; he argued that this failure made Ryan Air's motion to compel unripe. The court granted the motion and ordered Baker to comply with Ryan Air's discovery requests.

In November Baker again moved for a stay of the order to compel the transfer, in light of his notice of appeal to this court. The superior court denied the motion.

In December Ryan Air moved for an order to show cause why Baker should not be held in contempt for failing to comply with the court's orders to deliver executed conveyance documents to Ryan Air and to respond to Ryan Air's discovery requests. The court scheduled a show cause hearing to allow Baker to explain why he had failed to comply with these orders. At the show cause hearing, Baker signed the conveyance documents.

As these post-trial proceedings continued, Ryan Air also filed three motions for actual attorney's fees and costs, as specified in the Sublease Agreement. The first motion was filed soon after trial and sought $84,467 in attorney's fees and $887.92 in costs from the beginning of the litigation through July 12, 2013. The second motion was filed concurrently with Ryan Air's request for a show cause hearing and sought an additional $39,663.50 in post-trial attorney's fees. The final motion was filed in February 2014 and sought a further $16,655.25. Over Baker's repeated objections that Ryan Air's

fees were inflated and unreasonable, the superior court granted Ryan Air's attorney's fees and costs requests in full.

Baker appeals the superior court's finding that the Purchase Agreement remained in full force and effect, the order compelling him to transfer the leasehold to Ryan Air, the court's calculation of the remaining balance on the property, and Ryan Air's attorney's fees awards.

## IV.   STANDARD OF REVIEW

We review factual findings for clear error and legal conclusions de novo.[6] "A factual finding is clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are definitely and firmly convinced that the finding is mistaken."[7]   We resolve mootness issues using our independent judgment because applying the mootness doctrine presents a question of law.[8]  Contract interpretation is also a question of law that we review de novo.[9]   When interpreting a contract, our "goal is to give effect to the reasonable expectations of the parties."[10]

We "review a superior court's determination of prevailing party status and attorney's fees for abuse of discretion and will overturn such determinations only if they

---

[6]      *Simone H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 284, 288 (Alaska 2014) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[7]      *Id.* (citing *Barbara P. v. State, Dep't of Health & Soc. Serv., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[8]      *In re Mark V.*, 324 P.3d 840, 843 (Alaska 2014) (*citing Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001)).

[9]      *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014) (citing *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[10]      *Villars*, 277 P.3d at 768 (quoting *Knutson v. Knutson*, 973 P.2d 596, 600 (Alaska 1999)) (internal quotation marks omitted).

are manifestly unreasonable."[11]  However, "[t]he independent standard of review . . . applies to considering whether the trial court properly applied the law when awarding attorney's fees."[12]

## V.     DISCUSSION

### A.     The Superior Court Did Not Clearly Err By Concluding That The Purchase And Sublease Agreements Remained In Full Force And Effect.

Baker argues that the superior court erred by failing to recognize that Ryan Air had materially breached the Sublease Agreement.  Baker claims that Ryan Air defaulted on the Sublease Agreement by altering the property without prior written consent and by subleasing an aircraft tie-down spot without permission.  Baker argues that, as a result of these alleged breaches, he had the "right to terminate the sublease, repossess the buildings, and demand damages for repairs" rather than sell the leasehold to Ryan Air.  And he claims that the court's conclusion that the breach claims would be moot upon completion of the sale "put[] the cart before the horse," because the sale could only be completed if Ryan Air were not in default.  Ryan Air responds by noting that the superior court found no material breach of contract and supported this conclusion with factual findings.  Ryan Air also points out that Baker conceded the mootness issue in his testimony at trial.

#### 1.     Ryan Air did not materially breach the contract.

The superior court found that Ryan Air's renovations were "appropriate" under the contract, that the tie-down sublease was a "non-issue" and "not material in any

---

[11]     *State v. Jacob*, 214 P.3d 353, 358 (Alaska 2009) (quoting *Braun v. Denali Borough*, 193 P.3d 719, 726 (Alaska 2008)) (internal quotation marks omitted).

[12]     *DeNardo v. Cutler*, 167 P.3d 674, 677 (Alaska 2007) (alteration in original) (quoting *Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1073 (Alaska 2005)) (internal quotation marks omitted).

way," and that Baker had not provided Ryan Air with a valid notice of breach or a sufficient opportunity to cure. Baker appeals these findings.[13]

### a. Baker waived his right to object to Ryan Air's renovations by approving Ryan Air's request for a building permit.

The superior court determined that Ryan Air's renovations were appropriate because Ryan Air received a building permit from DOT. The court noted that the Sublease Agreement specifically provided that Ryan Air "[b]efore placing fill material or beginning construction of any improvements or demolishing any improvements . . . must first obtain the written approval of [DOT and Baker] *in the form of an approved building permit*." (Emphasis added.) Baker argues that this finding was clearly erroneous because he never provided prior written consent to the demolition work and because the project exceeded the scope of the permit. We disagree.

Baker initially argues that "Ryan Air didn't have *anything* in writing from Baker authorizing Ryan Air's demolition." (Emphasis in original.) And he argues that Ryan Air only speculated as to Baker's consent. But these claims ignore the email Baker sent to DOT, which expressly stated, "Please accept this email as approval from me for [Ryan Air's proposed] improvements." These improvements, which included the *replacement* of exterior siding and the installation of a new, heated concrete floor, necessarily required at least some demolition.

When presented at trial with his email to DOT, Baker testified that he had "no choice" but to authorize the project because he learned about it only after Ryan Air had begun demolition. This claim strains credulity. The Sublease Agreement specified an obvious alternative to consent: Baker could have notified Ryan Air of the breach,

---

[13]     The superior court also found that Ryan Air was justified in discontinuing rent payment from October 2012 to the date of trial because of its prepayments. Baker does not appeal this finding.

provided an opportunity to cure, and then terminated the Sublease Agreement if Ryan Air refused to comply. Instead, Baker explicitly approved the project in his email to DOT, thereby waiving his right to take action against Ryan for this alleged breach. While it is true that the Sublease Agreement contained an anti-waiver provision,[14] we have upheld the waiver of contractual rights even in the presence of much more stringent anti-waiver language.[15]

Baker argues in the alternative that he approved only the limited renovations authorized by the building permit, and he claims Ryan Air exceeded the scope of the permit.[16] This argument is somewhat stronger than Baker's initial claim that he did not assent at all to the renovations, because Ryan implicitly acknowledged at trial that Ryan Air's plans exceeded those specified by the permit. Nevertheless, for Baker's argument to carry weight, Baker would need to have lacked knowledge about Ryan Air's full intent when he approved the project and waived his right to object.[17]

---

[14] The anti-waiver provision provided that "[t]he failure by any party to object to a default under or breach of this Agreement shall not constitute a waiver, either expressed or implied, of the right to do so in the event of any future or continuing default under or breach of this Agreement." Baker not only failed to object but affirmatively consented.

[15] *See Dillingham Commercial Co. v. Spears*, 641 P.2d 1, 7-8 (Alaska 1982) (finding an implied waiver despite a "non-waiver" clause stating that "[o]nly waivers in writing executed by Landlord shall be effective. No delay or omission on the part of Landlord in exercising any of its rights shall operate as a waiver of such right or any other right.").

[16] Specifically, the permit authorized only the installation of a new boiler, a heated concrete floor, an exterior concrete pad on one side of the building, and the replacement of exterior siding.

[17] *See Deptula v. Simpson*, 164 P.3d 640, 644 (Alaska 2007) ("[W]aiver must be knowing and voluntary.").

While Baker makes this predicate claim, his testimony at trial rebuts it. Baker claims that "Ryan Air did not set forth its plans to turn Building B into a warehouse[] and did not request authorization to remove the second story and all the floors and walls." He also states that he would "never" have gone along with the full extent of Ryan Air's demolition work. But according to his own recounting of events, Baker discovered that the building had been "completely gutted" in June or July of 2008.[18] If this claim is accurate, Baker knew about the full scope of the project more than two years before he authorized it in September 2010. He can hardly plead ignorance about Ryan's intentions. Therefore, even if his testimony is credited in full, Baker twice waived his right to object, first by failing to object to the project for more than two years and later by expressly authorizing it.

For these reasons, the court did not clearly err by determining that Ryan Air's renovations were not a material breach of contract.

### b. Ryan Air's tie-down sublease was not a material breach, and Baker failed to raise the issue in his pleadings.

The superior court found that Ryan Air's tie-down sublease to DOT was "not material in any way" and a non-issue in the case. Baker contests these findings, arguing that this sublease caused him to lose out on the "significant opportunity" to lease a tie-down spot to DOT himself and to enjoy "spinoff opportunities."

But the superior court's conclusion that the tie-down breach was immaterial was supported by the parties' testimony at trial. Ryan testified that Ryan Air lost money from the sublease and entered into the agreement for the sole purpose of pursuing a specific spinoff opportunity: enticing DOT to use its freight services. Baker admitted

---

[18] Baker testified: "I looked through the windows on the second story and I could see daylight through the other side . . . . [I w]ent and . . . looked in, and it had been completely gutted. There was no upstairs. There was no downstairs. There was just ground."

that he does not provide freight services, and he has suggested no other spinoff opportunities foreclosed to him by the sublease. As a result, Baker was not denied any short-term profits, because there were none. And Baker has failed to prove lost opportunity damages, because he has suggested none.

Moreover, the court's conclusion that the tie-down sublease was irrelevant is supported by Baker's failure to raise the issue in his pleadings. Baker's claims of breach covered only Ryan Air's renovations and alleged failure to pay rent from September 2012 onwards.

### c. Baker failed to provide Ryan Air with a valid notice of default.

The superior court concluded that Baker failed to send Ryan Air a valid notice of default — a prerequisite for terminating the Sublease Agreement. The court found Baker's eve-of-litigation notice of breach lacking because it did not adequately describe the alleged defects or problems and was not copied to DOT.

In his briefing, Baker argues that he provided notice, but he fails to articulate any error in the court's conclusion that his notice letter to Ryan Air was inadequate.[19] Instead, Baker's sole argument seems to be that Ryan Air "never contended that it wasn't [apprised] of its breaches." But this is incorrect. Ryan testified at trial that the notice letter contained no particulars about the problems with the renovation project.

Moreover, we agree with the superior court's conclusion that the contents of the notice letter were inadequate to apprise Ryan Air of its alleged breaches pertaining to the renovations. Baker's letter merely claimed that "the sublessor has discovered that the building has been substantially altered from its original structure causing a decrease

---

[19]     Baker also argues that his failure to notify DOT was immaterial because that provision was intended to benefit DOT, not Ryan Air. We do not need to reach this issue, because the inadequacy of Baker's notice to Ryan Air independently supports the court's conclusion that the notice of breach was insufficient.

in property value." But Baker had known about this alteration for years and had at least partially consented to it in writing. For Baker to have provided Ryan Air the "particulars" of the alleged default as required by the Sublease Agreement, he would have needed to explain how Ryan Air was exceeding the scope of his authorization. The court did not clearly err by concluding that Baker had failed to do so.

### 2. The sale of the leasehold rendered Baker's minor breach claims moot.

At trial, Baker conceded that if the sale were to proceed, any damages caused by Ryan Air's renovation project would be moot.[20] He nevertheless contests the court's mootness finding. We review this already conceded argument for plain error only.[21] "Plain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[22] We see no such error here.

Because the superior court concluded that the Purchase Agreement remained in full force and effect — a finding we affirm — it logically follows that the subsequent transfer of the property for the agreed-upon price rendered Ryan Air's remaining alleged breaches moot. Baker's "Notice of Breach of Contract" contained only two alleged breaches: unpaid rent and damage to property. But Ryan Air necessarily reimbursed Baker for any unpaid rent by paying Baker the outstanding balance on the property. And

---

[20]  Baker was asked: "If Ryan Air completes the purchase of the leasehold interest, then whether or not it's made improvements or repairs or caused damage to the building is moot; is that correct?" He answered in the affirmative and later conceded, "[Y]ou're right, . . . ruining the building is a moot point if [Ryan Air] own[s] it."

[21]  *Partridge v. Partridge*, 239 P.3d 680, 685 (Alaska 2010) ("We will not consider arguments that parties fail to raise in the lower court, let alone arguments they have conceded below, unless the trial court committed plain error." (quoting *Tybus v. Holland*, 989 P.2d 1281, 1285 (Alaska 1999)) (internal quotation marks omitted)).

[22]  *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000) (quoting *Broeckel v. State, Dep't of Corr.*, 941 P.2d 893, 897 (Alaska 1997)) (internal quotation marks omitted).

Ryan Air assumed any loss that stemmed from the alleged diminution in property value. Because Ryan Air took possession of the leasehold for the agreed-upon price, Baker and his predecessors in interest received their benefit from the bargain: $600,000.

**B.      The Superior Court's General Approach To Calculating The Remaining Balance On The Property Was Not Clearly Erroneous.**

The superior court concluded that Ryan Air owed Baker $127,000 to complete the sale. The court reached this figure by finding that Ryan Air had paid $473,000 in rent and subtracting that amount from the $600,000 purchase price provided in the Purchase Agreement. Baker argues that the court erred by concluding that Ryan Air had already paid $473,000, because the court's calculations failed to reflect a contract modification he claims occurred in 2009. Additionally, Baker argues that the court double-counted $11,000 in rent payments.

From October 2009 to August 2012, Ryan Air paid Baker $5,000 per month in rent instead of the $3,000 required by the Sublease Agreement. The parties dispute the reason for this increase. Baker testified that, after he bought the leasehold from Baker Aviation and realized that the terms of the agreement were unfavorable to him, he approached Ryan to request additional rent and to notify Ryan that if the sale did not commence by the end of the year, they would "have to make sure no more rents go towards paying off the total." Baker further claimed that Ryan agreed to these modifications. Ryan acknowledged that he increased his rent payments at Baker's request, but he characterized the increase as a prepayment that did not change the underlying terms of the contract. Ryan testified that the purpose of the increased rent was to help Baker's mother, who was experiencing health problems.

The superior court concluded that "[t]here was never an agreement to raise the rent from $3,000 to $5,000" and backed this conclusion with three factual findings. Baker contests each of these findings.

First, the court found that Baker was not in a position to unilaterally change the terms of the contract:

> [Baker] recognized that, from his perspective, the terms were not a good deal financially . . . . However, his attempts to make changes were contrary to the written terms of the Purchase Agreement and the Commercial Sublease, which together gave Ryan Air the option in its sole discretion to continue making rental payments of $3,000 per month and to have those payments applied to the purchase price.

This finding is not clearly erroneous. The court accurately summarized the rent payment and purchase option provisions of the Purchase and Sublease Agreements. And Baker testified that he unilaterally requested an increase in rent payments and demanded that rents no longer apply to the purchase price. He later admitted on cross-examination that he provided no consideration for this requested modification.

Baker argues on appeal that Ryan Air *did* receive consideration — "additional time to complete the sale after the December 2009 target date." We find this claim unconvincing because it assumes Ryan Air was required to close by December 2009 — an assumption predicated on Addendum 2's requirement that Ryan Air "complete[] the purchase in a reasonable amount of time" after the property became "ready for sale." But the property was *not* ready for sale in 2009, at least not with a deed "showing free title, clear of encumbrances" as required by the Purchase Agreement. The property was still burdened with at least one mortgage, which was attached in 2008 and remained until 2013. Therefore Ryan Air was under no obligation to close in December 2009. Without such obligation, Baker's waiver of his unilaterally imposed and

unenforceable "deadline" could not constitute consideration.[23]  And without consideration, there could be no modification.[24]

Second, the court found that, under the Sublease Agreement, any significant modification was required to be in writing:

> [I]f the parties had intended to change the rental rate from $3,000 to $5,000 per month, that kind of change was required to be documented in writing as a change to the [Sublease Agreement].  Similarly, if the parties had agreed that the rental amount would not be a set-off to the purchase price, that change also was required to be documented in writing.

The text of the Sublease Agreement supports this conclusion.  It states that "[n]o amendment, deletion, addition or novation to or of this Agreement shall be effective unless it is completely and unambiguously contained in a writing executed by all the parties of this Agreement."

Baker does not deny the absence of a written modification.  Instead, he argues that a party may demonstrate a contract modification through evidence of an oral agreement along with evidence of the parties' subsequent conduct,[25] and that after parties

_____

[23]    Baker also argues that Ryan Air received consideration in the form of "some assurance that Baker's mother, a person important to Ryan, would obtain needed medical treatment."  This is simply incorrect as a matter of law.  "To constitute consideration, a performance or a return promise must be bargained for."  RESTATEMENT (SECOND) OF CONTRACTS § 71(1) (1981); *see also id.* cmt. a (clarifying that "love and affection" are "insufficient" consideration to enforce a promise).  Even if Ryan received some moral or emotional benefit from helping the Baker family, he received no performance or return promise from Baker.  Thus there was no consideration.

[24]    *See Zuelsdorf v. Univ. of Alaska, Fairbanks*, 794 P.2d 932, 935 (Alaska 1990) ("[A] modification of [an] agreement requir[es] mutual consent and consideration.").

[25]    *See Alaska Statebank v. Fairco*, 674 P.2d 288, 292 (Alaska 1983) (continued...)

have orally modified their agreement, principles of estoppel bind them to their oral modifications.[26] He claims that in the present case "both parties have testified to an oral agreement, and their subsequent conduct from August-September 2009 to the commencement of litigation clearly supports that modification."

While his statements of law are unobjectionable, Baker exaggerates the extent to which Ryan's testimony and conduct support the claim that the parties modified their contract. The parties did agree at trial that Baker approached Ryan for a rent increase, and that Ryan Air increased its monthly payments by $2,000 from 2009 to 2012. However, there is no agreement on how that increase should be characterized. Baker testified that it was an increase in the rental rate representing a contract modification. Ryan testified that the increase was a mere prepayment of rent that did not reflect a change to the underlying contract. In light of the Sublease Agreement provision

---

**25** (...continued)
("[M]odification of a written contract may be effected either through subsequent conduct or oral agreements."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202 cmt. g ("[T]he conduct of the parties may be evidence of an agreed modification . . . .").

**26** *See Fairco*, 674 P.2d at 292 (affirming the superior court's finding that "[b]y its conduct and course of dealing Alaska Statebank led the principals into believing that payments . . . were not currently required and that no default existed. . . . Even if a default . . . did exist, Alaska Statebank waived the default and was further estoped to rely on any default . . . without first demanding payment or giving notice of default.").

prohibiting oral modifications,[27] the superior court did not clearly err by finding that the lack of a written modification supported Ryan Air's version of events.[28]

Finally, the court found that if the parties had intended to modify the Sublease Agreement, they would have signed Trial Exhibit 18, an unsigned proposed Addendum 4 to the Purchase Agreement. Baker argues that Exhibit 18 lacked both relevance and foundation because Ryan Air presented no evidence to suggest that Baker was previously aware of its existence. Baker is correct. Trial Exhibit 18 was introduced during Baker's cross-examination, Baker denied ever seeing it, and Ryan Air provided no foundational support. The document should not have been admitted or considered as evidence.

But the superior court's other findings provide more than adequate support for its conclusion that the parties did not agree to modify the contract in 2009. Therefore the court did not clearly err in finding that Ryan Air's increased monthly payments constituted prepayments and that Ryan Air was entitled to apply those payments to the final purchase price.[29]

---

[27] *Cf. Freidco of Wilmington, Del., Ltd. v. Farmers Bank*, 529 F. Supp. 822, 831 (D. Del. 1981) ("The lease provided that it could be amended only in writing. While under Delaware law an agreement containing such a provision may be orally amended, the existence of an agreement calling for formal amendments is circumstantial evidence tending to show that informal amendments did not occur.").

[28] Moreover, even if the parties did attempt to orally modify the contract, the modification would be invalid for lack of consideration, as noted above.

[29] Baker also argues that, even if the parties intended to treat the increased rent payments as prepayments, the payments from 2010 on should not be counted toward the purchase price because "the parties [separately] agreed that rental payments would not be applied to the purchase price . . . beginning in January 2010." But the superior court also rejected Baker's claim that the parties had made this separate agreement. And, again, there was no consideration to support this modification. We therefore find this

(continued...)

Nevertheless, Baker correctly notes that the superior court undercalculated the remaining balance on the property by $11,000, because three of Ryan Air's rent payments were counted twice. The court relied on Ryan Air's accounting spreadsheet to calculate the outstanding purchase price of the leasehold and concluded that the spreadsheet omitted the three rent payments, which were referenced in a separate accounting document. But Baker points out that Ryan Air introduced the accounting document only to verify payments already included in the spreadsheet. Ryan Air agrees that the $11,000 was erroneously double-counted. We therefore remand to allow the superior court to address this single issue.

### C.   The Superior Court Did Not Clearly Err By Ordering Baker To Sign The Transfer Documents As Drafted By Ryan Air.

After the trial, Ryan Air sent conveyance documents to Baker's attorney. When Baker repeatedly failed to respond to Ryan Air's inquiries about the status of the documents, Ryan Air moved to compel Baker to sign them and later moved that the property be transferred without Baker's signature. The court granted both motions, and Baker ultimately signed the conveyance papers.

Baker contends that the warranties contained in the conveyance documents were inconsistent with the "statutory quitclaim deed" specified by the Purchase Agreement, and claims that the superior court erred by forcing him to sign the documents as drafted. In response, Ryan Air argues that Baker misconstrues the language of the Purchase Agreement and ignores its explicit references to warranties.

#### 1.   The parties originally bargained for more than a simple quitclaim deed.

---

**29**      (...continued)
argument to be without merit.

The deed specified by the Purchase Agreement is unusual. The Purchase Agreement's pertinent provision states in full:

> At closing, Seller shall furnish a *statutory quitclaim deed* in form and content as shown on attached Exhibit A, *showing free title, clear of encumbrances*, except conditions, restrictions, reservations, and rights-of-way of record as accepted by Buyer. (Emphasis added.)

Though this provision references an attached "Exhibit A," the parties agree that Exhibit A was never attached. Another provision of the Purchase Agreement also required Baker to guarantee that there were no liens against the property as well as no undisclosed easements or encumbrances.

Baker argues that the Purchase Agreement did not require him to provide *any* warranties on the property. He focuses on the provision's "statutory quitclaim" language and suggests that the conveyance documents should have been based on AS 34.15.040, which provides a model quitclaim deed.[30] Ryan Air responds by noting that Baker's "singular focus" on the term "quitclaim deed" ignores everything that comes after it, including the words "showing free title, clear of encumbrances."

Baker claims that the phrase "free title" is undefined in the contract and unused in Alaska statutes, regulations, and case law. While this may be technically true, the phrase "free and clear" is commonly found in our cases.[31] And the three words

---

[30] "The grantor (here insert the name or names and place of residence), for and in consideration of (here insert consideration) conveys and quitclaims to (here insert grantee's name or names) all interest which I (we) have, if any, in the following described real estate (here insert description), located in the State of Alaska." AS 34.15.040(a).

[31] *See, e.g.*, *Partridge v. Partridge*, 239 P.3d 680, 684 (Alaska 2010) ("James and Erlinda owned the Yamhill property 'free and clear' at the time of trial."); *Wolff v. Cunningham*, 187 P.3d 479, 484 (Alaska 2008) ("Cunningham . . . desire[d] to obtain (continued...)

following "free title" — "clear of encumbrances" — leave little room for interpretation; even Baker does not directly question their meaning.

Instead, Baker argues that everything after the words "statutory quitclaim deed" was inserted to give Ryan Air the *option* of purchasing the leasehold despite its liens and encumbrances. But this reading renders most of the provision's language superfluous.[32] It also ignores the specific warranties required under the Purchase Agreement. If the parties had intended to contract for a mere quitclaim deed, as Baker claims, there would have been no reason to include the superfluous language or to explicitly list warranties against liens, easements, and encumbrances in the Purchase Agreement.

Despite Baker's attempt to read ambiguity into the language of the contract, we see only one way to reasonably interpret the intent of the parties at signing. The parties agreed to start with a quitclaim deed, add the warranties specified in the Purchase Agreement, and subtract from those warranties any "conditions, restrictions, reservations, and rights-of-way of record" that Ryan Air chose to accept or had previously waived. We therefore conclude that the court did not err by finding that the Purchase Agreement anticipated more than a simple quitclaim deed.

---

[31]     (...continued)
Igloo Ice free and clear of CSED's lien."); *Mullins v. Oates*, 179 P.3d 930, 933-34 (Alaska 2008) ("Oates . . . [sought] an order and judgement [sic] declaring that Mullins's 'rights, title and interest in and to the . . . real property are foreclosed and title to the . . . real property is vested in [Oates] free and clear of any right, title and interest [Mullins] may have." (alterations in original)).

[32]     *See* RESTATEMENT (SECOND) OF CONTRACTS § 203 cmt. b (1981) ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous."); *accord Alaska State Hous. Auth. v. Sipary*, 668 P.2d 824, 827 (Alaska 1983) ("Effect should be given, where possible, to every part of a contract.").

## 2. The Purchase Agreement required Baker to provide all of the warranties included in the conveyance documents.

The superior court ordered Baker to sign a Deed of Conveyance document requiring him to guarantee that the property was "free and clear of all mortgages, liens, claims, charges, encumbrances, security interests, pledges or title retention agreements or leases of any kind or nature." The accompanying Assignment of Lease document further required:

> In addition to the representations and warranties set forth in the [Purchase Agreement and Addenda], Assignor represents and warrants to Assignee that as of the Closing Date . . . (a) Assignor is the Lessee under the Ground Lease; (b) the Ground Lease is in full force and effect; (c) Assignor has good title to the leasehold interest in the property; (d) that the Lease is free of any and all claims, liens and encumbrances, and (e) Assignor has the legal right and authority to assign and transfer the Ground Lease . . . .

Baker claims the superior court erred by forcing him to agree to representations and warranties "in addition to" those set forth in the Purchase Agreement. In response, Ryan Air notes that Baker has not articulated any warranties in the conveyance documents that were not included in the Purchase Agreement. We find Ryan Air's position more convincing.

Although Baker expresses valid concern that the warranties in the Assignment of Lease were stated to be "in addition to" those promised by the Purchase Agreement, he fails to explain how the listed warranties actually exceed those bargained for. The Purchase Agreement required Baker to warrant that he had full authority to sign the agreement and perform the sale and that there were no liens or undisclosed encumbrances on the property. The agreement also included a "[n]o merger" provision, which specified that these warranties would survive closing. Baker fails to explain how

the warranties in the conveyance documents fall outside those already listed in the Purchase Agreement.

Baker also argues that Ryan Air's alleged breaches of contract render him unable to provide all the warranties enumerated in the conveyance documents. Specifically, he argues that DOT might revoke the underlying lease because Ryan Air's renovation project exceeded the scope of the building permit. This argument might have carried weight if the Assignment of Lease promised that the leasehold would remain intact after closing. It does not. Instead, Baker was required to warrant only that the leasehold was intact, free of encumbrances, and transferable by him *as of the closing date*. Baker's argument is therefore without merit.

Because the Purchase Agreement provided for the warranties included in the conveyance documents, we conclude that the superior court did not err by requiring Baker to sign the documents as drafted.[33]

D. **The Superior Court Did Not Abuse Its Discretion By Declining To Reduce Ryan Air's Attorney's Fees Awards.**

The superior court granted Ryan Air's requests for attorney's fees, which totaled $140,785.75. Baker argues that the attorney's fees awards were per se unreasonable in light of the amount in controversy and the simplicity and narrowness of the issues. Baker also criticizes individual billing entries, claiming that Ryan Air's attorney billed for administrative and irrelevant tasks, inflated his hours, and kept vague time records. Ryan Air disputes these claims and notes that Baker's post-trial conduct led to no fewer than 40 additional filings, which significantly increased Ryan Air's legal expenses.

---

[33] Because we conclude that the drafted conveyance documents accurately reflected the parties' original agreement, we do not need to reach Baker's argument that Ryan Air committed constructive fraud by drafting warranties into the documents.

Baker's primary argument is that Ryan Air's attorney's fees awards were per se unreasonable in light of the amount at stake in this case, which Baker claims was only $144,445.95 — the difference between Ryan Air's and Baker's pre-trial estimates for the amount needed to complete the leasehold purchase. But we have previously rejected the bright-line approach Baker advocates:

> Some cases involve important matters of principle, or personal liberty, yet offer only a modest monetary recovery. . . . Even where a matter of principle is not at stake and the client pays his or her attorney by the hour, the superior court's determination of the maximum likely recovery should not become a hard upper limit on the amount of reasonable actual attorney's fees.[34]

Moreover, as Ryan Air points out, the amount at stake was far greater than Baker suggests. Had Baker succeeded on his counterclaims, Ryan Air might have forfeited the $462,000 it paid towards the purchase price, lost the $125,000 it had invested in improving the facility, and been found liable for $282,607.35 in contract damages. Compared to the risk of losing nearly $870,000, spending $140,785.75 for the assistance of counsel does not appear facially unreasonable.

Baker also argues that the legal and factual issues in this case were too simple to justify spending $140,785.75 on attorney's fees. He emphasizes that the trial involved only three witnesses and took only two days. But other than noting the scope of the trial and disputing a few minor billing entries, Baker fails to point to any major tasks on which Ryan Air's attorney spent inordinate amounts of time. The largest billings in Ryan Air's attorney's fees exhibits covered research, drafting letters and

---

[34]    *Valdez Fisheries Dev. Ass'n v. Froines*, 217 P.3d 830, 833 n.19 (Alaska 2009) ("[T]he superior court explained that its first award was also based on its determination 'that it would not be reasonable for any party to expend attorney fees in excess of the maximum likely recovery.' That assumption was incorrect.").

motions, conducting discovery, preparing for trial, conducting the trial, and writing proposed findings of fact and conclusions of law at the court's request. These tasks and the times allotted appear reasonable and reveal that Ryan Air's lawyer was diligent but not dilatory.

Moreover, the cases Baker cites provide little support for his argument that the attorney's fees awards in this litigation were per se unreasonable. In *In re Johnson* we concluded that an attorney's fee award was excessive because the billings were vague and the attorney was unable to account for about a third of the charged fees.[35] But we declined to "determine exactly what percentage, if any, is high enough to make attorney's fees per se unreasonable," holding instead that "the higher the attorney's fees in relation to the total value of the estate, the more prepared an attorney should be to defend those fees."[36] And though we determined that the attorney failed to prove the reasonableness of the unaccounted-for fees, we sustained the rest of the award.[37] Here, Ryan Air's attorney accounted for all of his billings, and Ryan Air provided additional clarifications to the superior court in response to Baker's specific criticisms about individual billings. Baker's invocation of *Johnson* is therefore inapt.

And in *Zeilinger v. SOHIO Alaska Petroleum Co.*, a wrongful discharge case, we concluded that "the claimed actual fees of $200,000 appear[ed] clearly excessive" because the legal issues were relatively straightforward and "[t]he facts . . .

---

[35] 119 P.3d 425, 434, 436 (Alaska 2005). The attorney explained only that the fees pertained to " 'tax matters' and 'assisting the personal representative in fiduciary matters.' " *Id.* at 435.

[36] *Id.* at 433.

[37] *Id.* at 436 ("Because Hughes, Thorsness failed to meet its burden as to $68,500 of the fees, we must vacate the superior court's order to that extent.").

were not particularly complex or unique, *nor even subject to much dispute.*"[38]  But here some of the most critical facts — the interpretation of the contract, whether the parties had modified their agreement, and whether Ryan Air was in default — were highly contested.  And Baker himself increased the complexity of this case by claiming 14 separate material breaches of contract in his counterclaim.

Finally, we find Baker's criticisms of Ryan Air's specific billings to be unpersuasive.  The attorney's fees provision in the Sublease Agreement provided that "[a]ll legal costs and attorneys fees actually incurred by any party to this Agreement to enforce the duties or obligations of any other party under this Agreement . . . shall be paid to the prevailing party by the other party . . . ."  Baker presents us with many of the same arguments he made in his superior court briefing, but he fails to acknowledge that Ryan Air provided the court with additional clarifications in response to that briefing.  The superior court could have reasonably concluded that the language of the Sublease Agreement encompassed all of the billings Baker now contests.  Furthermore, Baker significantly increased Ryan Air's attorney's fees after the trial by refusing to negotiate the transfer of the leasehold in good faith, as ordered by the court.

After independently reviewing Ryan Air's billings, we conclude  that the superior court did not abuse its discretion when it made these attorney's fees awards.

## VI.    CONCLUSION

We REMAND to allow the superior court to adjust the judgment by $11,000 to address Ryan Air's double-counted rent payments.  We AFFIRM the superior court's decision in all other respects.

---

[38]    823 P.2d 653, 659 (Alaska 1992) (emphasis added).